CARL IPPOLITO, MICHAEL CAMMARATA, CHARLES TOU-
RINE AND FRANK POLLASTRELLI, PROSECUTORS, v.
JAMES S. TURP, JUDGE OF THE COURT OF COMMON
PLEAS OF MERCER COUNTY, CHARLES J. FALCEY,
ACTING JUDGE OF THE POLICE COURT OF THE CITY
OF TRENTON, AND THE POLICE COURT OF THE CITY
OF TRENTON, RESPONDENTS.

Submitted October 1, 1940—Decided May 6, 1941.

Before Justices CASE, DONGES and HEHER.

For the prosecutors, *Andrew M. Cella.*

For the respondents, *Louis Josephson.*

The opinion of the court was delivered by

CASE, J.    The writ of *certiorari* brings up judgments
entered in the Police Court of the City of Trenton convicting
the prosecutors of a violation of *R. S.* 2:202-16 and the order
of the Mercer County Court of Common Pleas affirming those
convictions.    There were four identical complaints, one
against each of the prosecutors, and the complaints severally
charged that the defendant therein named was on each and
every one of the days from March 6th, 1939, to April 24th,
1939, inclusive, engaged in an illegal occupation, bore a bad
reputation and consorted for an unlawful purpose with

thieves, criminals and persons who bore a bad reputation, to wit, (here naming all of the four prosecutors other than the one against whom the complaint was lodged) and one Mark Anthony contrary to and in violation of "An act concerning disorderly persons," *R. S.* 2:202-16. That statute in its pertinent portion provides as follows: "Any person who shall be apprehended and shall be proven to the satisfaction of the magistrate, recorder or judge before whom he shall be brought to be a person who is engaged in an illegal occupation or who bears a bad reputation, and consorts for an unlawful purpose with thieves, burglars, pickpockets, swindlers, confidence men, or other criminals or persons who bear a bad reputation shall be adjudged a disorderly person. In any prosecution under this paragraph the fact that the person apprehended is engaged in an illegal occupation or bears a bad reputation and is found consorting with thieves, burglars, pickpockets, swindlers, confidence men, or other criminals, or persons who bear a bad reputation, shall be *prima facie* evidence that such consorting was for an unlawful purpose." It appears that of the four prosecutors Charles Tourine has never been convicted of crime; Carl Ippolito has never been convicted of a crime, although he was convicted on a charge of being a disorderly person; Cammarata was convicted in 1932 of breaking and entering, served a sentence thereon and was released on April 7th, 1939, from the New Jersey State Prison; and Pollastrelli had been convicted of a violation of the Lottery laws. The meetings between one and another of the prosecutors were entirely peaceable, displayed no criminal aspect and had not the appearance of being planned conferences but rather casual meetings of one with another at a meal, on the street, at an automobile door or otherwise for periods varying from two to forty minutes; which, of course, is not to say that there was not opportunity for, or was not in fact, wrongful scheming. The statute does not define the word "consort;" nor do our cases give a nicely measured significance to the word. It, therefore, becomes important to ascertain whether, and if so wherein, the statute lays guilt in a consorting by and with others than criminals. By the elimination of a portion of the paragraph we discover this

provision: "Any person who shall be apprehended and shall be proven to the satisfaction of the magistrate * * * before whom he shall be brought to be a person * * * who bears a bad reputation, and consorts for an unlawful purpose with * * * persons who bear a bad reputation shall be adjudged a disorderly person. * * * In any prosecution under this paragraph the fact that the person apprehended * * * is found consorting with * * * persons who bear a bad reputation, shall be *prima facie* evidence that such consorting was for an unlawful purpose."

It is forcefully argued that to read an unlawful purpose into a series of casual meetings, by one who is not shown to have done wrong, with others who are not shown to have done wrong, and to make such meetings sufficient reason for conviction and sentence to imprisonment is a deprivation of due process. We find it unnecessary, however, to decide that question for the reason that we find harmful error in certain evidence rulings at the trial.

Prosecutors complain, and we think justly, that the state in attempting to prove bad reputation resorted to inadmissible hearsay testimony. Evidence of reputation is itself in a sense hearsay but it is hedged by definite limitations. The proper method of pursuing the direct examination of a "character" or "reputation" witness is to ask the witness whether he knows the reputation of the subject in the neighborhood where the latter resides and, upon receiving an affirmative reply, to ask what that reputation is. *State* v. *Baldanzo,* 106 *N. J. L.* 498. The reply will be that it is good or that it is bad, or as the case may be. But the inquiry, on direct examination, is confined to general reputation. The proof may go to a particular quality that is in question, as for "morality" or for "honesty in living," *State* v. *Snover,* 63 *Id.* 382, but the inquiry is concerning one's general reputation on that attribute. Particular acts or specific facts are not admissible, either as original evidence or as evidence by way of rebuttal. For illustration, it has been held by our Court of Errors and Appeals that if the prisoner on his trial gives evidence that his character is good it is open for the prosecutor, by way of reply, to prove that the prisoner's character is bad; but evi-

dence of this character must be confined to general reputation, and particular acts or specific facts are not admissible, on the examination in chief, either as original evidence or as evidence by way of rebuttal. Where a person accused of a criminal offense produces evidence to show that his general reputation is good, it is not competent for the state in reply to put particular facts in evidence. *Bullock* v. *State*, 65 *Id*. 557, 577. This limitation was frequently transgressed in the trial under review. An instance, which in its salient aspects was repeated many times, occurred when Sergeant Raywood, a police officer of the City of Trenton, having testified that the reputation of Charles Tourine, one of the prosecutors, was bad, was asked, "Upon what facts is this statement made, that his reputation is bad?" Objection was duly noted. A part of the allowed answer was: "Well, we started a check with the state police on these men's records, checked their card numbers and found out they was unemployed and learned that Charles Tourine, who we seen coming out and had photographs of, was arrested under the name of Al Ferguson, and learned he [was] paying high prices for the rooms and coming in late hours in the morning, sleeping half the day or three-quarters of the day, and learned from the state police they was arrested in Mays Landing, Bordentown and Columbus for numbers, bad reputations, and also pleaded guilty to these charges." Again, the same witness having been asked concerning the reputation of the prosecutor Pollastrelli was asked, "Will you kindly tell us what you heard people say?" The question was objected to, as was every such question, upon the ground that it was hearsay. The objection was overruled and the answer was: "I heard there was hi-jackers, bootleggers, stick-up men, all kinds of racket men, congregating at the hotel—which I checked and found to be true." The judge, remarking that he was "only interested in what other people may say," struck the statement about checking and verification. So, too, regarding Ippolito—"A greater number of people spoke of him as one of the leading number writers in the city, and a former hi-jacker during prohibition, and wondered how he was conducting his bank and numbers, and holds bets at the Hotel Hildebrecht, and wondered how

he was getting away with it." Thus there came in as proof, not from those who knew, but from witnesses who told of what others had told them, that the defendants had police records, that they were unemployed, that they had been arrested under other names, that they had been arrested for numbers, had plead guilty, that they were "arrested for murder, stick-ups and one thing or another," were "hi-jackers," "conducting * * * numbers," "holds bets," "arrested and convicted," "arrested for murder up there [Newark] but they could never convict him on it," and so on. It is hardly necessary to say that hearsay testimony was not competent to prove specific facts, viz., that the defendants were thieves, burglars, pickpockets, swindlers, confidence men or other criminals. Every man is supposed to be capable of supporting his general reputation whenever it is attacked but not to meet specific transactions not an issue in the cause. See *State* v. *Polhemus,* 65 *Id.* 387. Otherwise, for obvious reasons, on cross-examination of a character witness. *Leonard* v. *Allen,* 11 *Cushing* 241. For a statement of the prevailing rule on the admission of specific acts as a part of the proof of reputation see 22 *C. J.* 481, §§ 579, *et seq.* The materiality of evidence of reputation in the instant case is apparent when we recall from the discussion *supra* that defendant may be convicted solely on proof of reputation and consorting. It is, therefore, essential to a fair trial that the proof of reputation shall be such as, under the law, is admissible.

Because of the errors in judicial rulings on the admission of evidence the judgments below are reversed, without costs.